IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

'09 NOV 23 P 4:18

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **CRIMINAL ACTION** |
| v. | No. 04-40141-02 |
| LINDA JOYCE KAUFMAN, | |
| Defendant. | |

### RESENTENCING DECISION

On October 27 a resentencing hearing was held pursuant to the remand ordered by the Tenth Circuit. Prior to the hearing, I ascertained from defendant's counsel that she desires to go ahead with resentencing rather than wait for the Supreme Court to act upon her application for writ of certiorari. To facilitate resentencing, I ordered the probation office to prepare an updated presentence report and I allowed counsel to submit sentencing memoranda and supplemental memoranda, which they did. At the resentencing hearing, the government presented the testimony of Phillip McManigal and Lt. Ken McGuire regarding the remanded issue concerning the "stun gun." Defendant gave a statement and Nancy Jensen, one of the Kaufman House residents, read into the record a written statement which was admitted as government's exhibit 1. I have reviewed selected excerpts from the ten volume trial transcript as well as the sentencing transcript. I have given respectful consideration to the sentencing guidelines, to the statutory factors under 18 U.S.C. § 3553 and pertinent case authority.

The first thing I'm going to do is make the necessary findings

to resolve the remanded issues. Then I will discuss some of the matters raised in the sentencing memoranda, defendant's statements, Nancy Jensen's statement and the arguments of counsel. Then I will explain and announce my sentence. To the extent that I do not comment on every argument advanced by the parties, it is because I do not believe a comment will add anything to the reasons for my decision or, in some cases, the arguments are unworthy of acknowledgment.

## Remanded Issue Concerning the Stun Gun

The Court of Appeals directed that on remand, I should address the questions of whether the stun gun was capable of inflicting serious bodily injury and whether Linda Kaufman used it, threatened to use it or aided and abetted in its use. I was instructed to explain the evidence on which I rely in reaching those conclusions.

The Court of Appeals noted that I did not apply the four level guideline enhancement for use of a dangerous weapon because the government's evidence did not demonstrate that the "zapper" was a "dangerous weapon" and suggested that I may not have believed that it was used on Peter in the manner described. There is no dispute that a device referred to as a "zapper" was present and in use, and threatened use, at the properties which came to be known as Kaufman House. Arlan Kaufman admitted having the device and described it in a memorandum which indicated, among other things, that the device would be used on every part of Peter's body except his head and face "with the full intent to inflict pain, humiliation and intimidation." The evidence at trial relating to the use of the "zapper" by Arlan Kaufman and, in particular, by Linda Kaufman is accurately reported at pages 8-12 of the government's sentencing memorandum. I did not

-2-

decline to apply the enhancement because I disbelieved the evidence regarding defendant's use of the device. On the contrary, I believed Peter's testimony and still do.

Had the government offered at trial the evidence which was received at the October 27 hearing, I would have applied the enhancement without hesitation. The evidence at the resentencing hearing was more than sufficient to demonstrate that the "zapper" was a "dangerous weapon" as defined in Guideline Section 1B1.1 Comment Note 1(D) and (L). Mr. McManigal interviewed Peter on August 25, 2009 and when shown a printout of various types of stun guns, Peter was able to identify a device which looked like the "zapper," a Panther PR500 500,000 volt stun gun. Defendant suggests that Peter's identification was flawed, at least insofar as the voltage capacity of the stun gun is concerned. To me, this is beside the point. Whatever may have been its voltage capacity, the stun gun was selected and used for the express purposes stated by Arlan Kaufman. None of the articles submitted by defendant regarding stun gun-type devices advocate or even suggest that it is appropriate to intentionally use a stun gun on a person's genitals, much less a person who is mentally-impaired. On the contrary, a source cited in one of the articles is instructive. It is entitled <u>Shocking Treatment: the Use of Tasers in Psychiatric Care</u> published in the Spring 2006 issue of the Journal of Law, Medicine & Ethics. Although the article focuses on the device known as a Taser, it notes that regulations and interpretive guidelines published by the U.S. Centers for Medicare and Medicaid Services do not consider the use of weapons in the application of restraint as a safe and appropriate health care intervention. "We

-3-

consider the term 'weapon' to include . . . stun guns . . . ."

The article goes on to say that "The first principle of health care ethics, *primum non nocere*, the duty to do no harm, should prevent the use of a weapon in dealing with patients except in imminently life threatening cases." This statement has special application to defendant, who was a nurse presumably bound by that or a similar principle.

Finally, the article contains certain conclusions which are directly pertinent to the facts of the case.

> In a clinical setting the use of Tasers may not only be inappropriate, but represent a violation of ethical norms that require the patient's interest be paramount in the treatment relationship.
>
> The harm done to a patient who is Tasered may be a permanent breach in the trust and healing that can occur in the therapeutic relationship. The use of weapons may exacerbate underlying anxieties and feelings of worthlessness and lead to a greater sense of shame and depression.
>
> * * *
>
> A second clinical effect that may be anticipated is a loss of trust in the other patients who may have witnessed a fellow patient being Tasered. Patients not involved in the cure of the patient who is Tasered may become frightened at witnessing or overhearing this event.

I doubt that the authors would change these conclusions just because the device used in this case was a stun gun instead of a Taser.

When the device was demonstrated at the hearing (albeit not on a person), it emitted a series of bright blue electrical arcs accompanied by rapid loud snaps. The court finds that such a device has an obvious intimidating and frightening purpose even if not actually used on an individual. It takes no imagination to predict

-4-

the effect of threatened use of such a device on persons suffering from the mental impairments of the Kaufman House residents.

I find from the essentially unrefuted testimony of Lt. McGuire that a stun gun of any voltage classification constitutes a "dangerous weapon" within the meaning of the guidelines. Lt. McGuire has been stunned 50-60 times and has suffered extreme physical pain. I credit Lt. McGuire's testimony that while stun guns have their legitimate uses, they are dangerous weapons if used incorrectly. Surely no one can dispute that application of an electric current of any voltage to man's penis and testicles would constitute incorrect use of a stun gun. The fact that Peter's description of the effect of the "zapper" as a "hard pinch" does not detract from a stun gun's capability of inflicting serious bodily injury such as extreme physical pain described by Lt. McGuire, nor does the fact that the pain ceases when the device is shut off. I must assume that the members of the Sentencing Commission, who presumably drafted or approved the definitions of "dangerous weapon" and "serious bodily injury," would conclude that use of a stun gun, particularly on a man's penis and testicles, fits the guideline definitions. I seriously doubt that any of them would volunteer to being "zapped" in order to prove or disprove the applicability of their definitions.

In her sentencing statement at the trial, defendant described Peter as "childish and selfish and violent and paranoid and dangerous" but she did not deny the existence of the "zapper" or dispute Peter's testimony that both she and her husband used the "zapper" on Peter's penis and testicles. She has not disputed the evidence this time around, even though she is aware that I have been directed to make

-5-

findings concerning the device. I am satisfied and find that Linda Kaufman used the "zapper," and aided and abetted Arlan in its use, as described in the testimony at trial. I totally reject defendant's unsupported argument that the "zapper" was used for self-defense, especially its use on Peter.

Accordingly, I intend to apply the four level guideline enhancement.

Remanded Issue Concerning the Large Number of Vulnerable Victims

As the Court of Appeals noted in its opinion, I previously declined to apply the large number of vulnerable victims enhancement because the guidelines did not define "large number." Nor, at that time, had the Tenth Circuit. I have been directed to determine individually which of the Kaufman House residents were vulnerable victims and that in deciding whether there was a "large number" of vulnerable victims, more than ten will suffice under Guideline Sections 3A1.1(b)(2) and 2H4.1.

Section 3A1.1, Application Note 2, provides that a "vulnerable victim" means a person who is the victim of the offense of conviction and any conduct for which a defendant is accountable under section 1B1.3 (relevant conduct) and who is unusually vulnerable due to age, physical or mental condition, or who is particularly susceptible to the criminal conduct. There has never been any contention, nor can there be, that the criminal activity of which defendant and her husband stand convicted does not constitute "relevant conduct." It does.

Similarly, the evidence clearly established that both defendants knew of the victims' unusual vulnerability. The record is saturated

with essentially undisputed evidence regarding the reasons why persons became "residents" at Kaufman House, as well as the conditions there. The Tenth Circuit has defined a "vulnerable victim" as someone who is unable to protect himself or herself from criminal conduct, and is therefore in need of greater societal protection than the average citizen. United States v. Shumway, 112 F.3d 1413, 1423 (10th Cir. 1997). Persons who did not fit this definition did not become Kaufman House residents.

Although the Court of Appeals did mention it, the trial jury unanimously found beyond a reasonable doubt that Mary H., Barbara T., Jonathan M. and Kevin R. were vulnerable victims. Defendant has conceded this finding. Therefore, to follow the Court of Appeals' directive, I must determine that an additional seven or more of the Kaufman House residents were vulnerable victims. I have done so but it certainly is arguable that most, if not all, of the Kaufman House residents were vulnerable victims. In her statement at sentencing following the trial, defendant described her "nursing services to my mentally ill patients." As defendant notes in her supplemental sentencing memorandum, many of the Kaufman House residents suffered from schizophrenia. Walter W. Menninger, M.D., whose credentials and more than 50 years experience in the field of diagnosis and treatment of mental illness are beyond dispute, testified at length about schizophrenia, which he described as the "cancer of mental illness." (Doc. 448 at 675-709). Dr. Menninger criticized every aspect of Arlan and Linda Kaufman's "treatment" of Kaufman House residents. He was questioned at length by both defendants' fine lawyers (id. at 738-800). In my view, and presumably in the jury's as well, his opinions

-7-

were untouched by cross-examination. In addition, Bonnie Buchele, Ph.D., testified regarding what constitutes appropriate and inappropriate psychological therapy, particularly involving individuals with diagnoses of schizophrenia. Her essentially unchallenged testimony was that the methods used at Kaufman House were inappropriate under any recognized standards (Doc. 455 at 1278-1395).

In its sentencing memorandum, the government has identified eight residents other than those four found by the jury as vulnerable victims: James, Tom, Peter, Nancy, Jerry, Gerald, Eldon and Albert. For her part, defendant reasserts her position that there are only five victims who can be considered vulnerable. In her supplemental memorandum, defendant says that James was found by the jury not to be a vulnerable victim but she has not cited the record and I have been unable to locate such a finding. The jury did not identify James as being held in involuntary servitude by Linda Kaufman but the jury was not asked whether James was or was not a vulnerable victim. Defendant also argues that while each resident had been diagnosed with mental illness, principally schizophrenia, more needs to be shown than that they are members of a certain class of individuals. More what? Shouldn't mental illness, much less schizophrenia, be sufficient to meet the Tenth Circuit's definition? I challenge anyone, including federal judges and members of the Sentencing Commission, to dispute that someone who suffers from mental illness, especially schizophrenia, and who was subjected to the environment and conditions of Kaufman House, would not meet the definition of "vulnerable victim." Nonetheless, because I have been directed by higher authority to determine individually which of the residents were

-8-

vulnerable victims, I have done so.

I have reviewed the record pertaining to the eight individuals identified by the government and find that the government's summary of their respective conditions is accurate. All were vulnerable victims. Defendant has not challenged the accuracy of the record citations or the government's summary. But the cold record does not tell the whole story. As I pointed out during oral argument, this is one of the very few cases in my tenure as a trial judge where video preservation of a witness's testimony would be helpful. Many witnesses who are entirely without any mental impairment are still nervous when they testify. Most, if not all, of the Kaufman House residents who testified were far more than nervous. Some were clearly terrified, not merely of being a witness but rather of having to testify in the presence of Arlan and Linda Kaufman.

Accordingly, I will apply the two level increase representing a large number of vulnerable victims.

## Remanded Issue of Obstruction of Justice

Finally, the Court of Appeals has directed me to apply a two level enhancement for obstruction of justice. All together, defendant's guideline sentence will be increased by eight levels which yields a total offense level of 41. Combined with defendant's criminal history category I, defendant's sentencing range under the guidelines becomes 324-405 months. Even if I were to apply only the obstruction of justice enhancement, defendant's total offense level would be 35 which yields a guideline sentence range of 168-210 months, more than double my original sentence of 84 months.

## Discussion of Defendant's Arguments

-9-

Defendant's basic position is that I should reimpose my original 84 month sentence, essentially by way of downward departures and/or a variance from whatever guideline sentence I deem to be applicable. Defendant first argues that downward <u>departures</u> under the guidelines are appropriate based on defendant's age, § 5H1.1 and defendant's mental and emotional conditions, § 5H1.3. Defendant acknowledges that neither of these policy statements are "ordinarily relevant." I find that defendant's age clearly is not relevant. Defendant is 66 years old. She argues that a lengthy prison sentence will "place her in jeopardy of dying in prison" which she acknowledges surely will be Arlan Kaufman's fate. I cannot think of enough negative words to describe Arlan Kaufman and his conduct in this case. Arlan Kaufman probably will die in prison and if that occurs, so be it. I am not persuaded by an argument that I should depart downward to a sentence which will not result in defendant dying in prison merely because that may be her husband's fate. I could not impose such a sentence unless I should know the date of defendant's death, something which no one knows.

Insofar as defendant's mental and emotional condition is concerned, I acknowledge that one of the reasons for my earlier sentence related to the testimony that defendant may suffer from a "dependant personality disorder." I will comment on defendant's personality in discussing her characteristics under § 3553(a)(1). Still, there is no basis in the record for me to consider a downward departure based solely on defendant's mental and emotional condition.

Defendant's alternative request for a downward <u>variance</u> requires me to discuss the § 3553 factors. To some extent, I'm going to take

-10-

the § 3553 factors out of order. But before discussing the factors, I want to dispose of defendant's arguments regarding percentages. It is true that the Tenth Circuit is now recognizing, some might say grudgingly, that district courts may vary from guideline sentences. While some opinions, for example United States v. Cook, mention variances in terms of a percentage, it is inappropriate to use my previous sentence of 84 months as the base line from which a new sentence can be calculated using various percentages of variance. This is because the 84 month sentence was based, in part, on an incorrect guideline determination which has been corrected in this decision. Now I'll turn to the § 3553 factors.

I've heard nothing to alter my earlier finding that the public does not need to be protected from further crimes of this defendant. I don't believe defendant will commit crimes in the future. There is no evidence that defendant needs to be provided with educational or vocational training, medical care of other correctional treatment of any specific nature. On the contrary, based on her statements at resentencing, defendant has adapted relatively well to confinement and has made positive contributions to the welfare of her fellow inmates. I have considered defendant's positive contributions in determining the appropriate sentence.

Much of what I said at the earlier sentencing hearing regarding the history and characteristics of defendant applies equally here. It was, and remains, hard for me to understand how, for more than twenty years, defendant was able to reconcile her training and experience as a nurse and her self-proclaimed Christian values with her conduct in this case. In her sentencing statement following the

-11-

trial, defendant repeatedly sought to separate her conduct from that of her husband by describing him as an expert on psychotherapy whereas her role was that of a nurse. She said "He was persuasive enough that I did not question his wisdom. He was the expert. Even when I had misgivings, I was expected to be a team player and support the views of the team leader. It was not my place to challenge his conclusions or to impose my own standards of dress or moral standards on the clients. My training as a nurse conditioned me that doctors give orders, nurses follow them. Dr. Kaufman was an expert. I was not an expert. Many years of living this pattern in our personal relationship undoubtedly blinded me to my duty to question and object. And for that, I'm truly sorry." At the time, I accepted this explanation. But this is resentencing de novo and this time around, I am less inclined to do so. Arlan Kaufman was not a physician. He was a social worker. His title notwithstanding, defendant's "doctor-nurse" analogy does not hold water. As Nancy Jensen pointed out in her statement, many of defendant's actions were inconsistent with her training and obligations as a nurse. I cannot imagine that defendant's training and experience as a nurse would allow her to believe that Arlan Kaufman's therapy methods represented any kind of recognized expertise in any field. If they were, where are the scholarly articles written by Arlan and Linda Kaufman describing the success of their pioneering therapy? Where are the published studies by others in their respective fields which validate their therapy methods? There aren't any and there won't be any.

To the extent that I bought into Linda Kaufman's protestations that she was some kind of unwilling pawn at the hands of her husband,

-12-

I don't do so now. Defendant participated in her husband's perverted practices, occasionally by action but more often by benign inaction. From time to time she covered up or intentionally mislead others regarding what was going on at Kaufman House. There is no evidence that defendant ever expressed any misgivings to her intelligent, educated adult children or to any of her friends who have provided misplaced support to her and her husband throughout this case.

What defendant *did* do, virtually alone without the direct involvement of Arlan Kaufman, was to keep Kaufman House in business through decades of healthcare fraud, mail fraud, lack of documentation of "treatment" and a general, persistent and successful effort to hide all the wrongdoing at Kaufman House. Ironically, some of the best evidence of defendant's critical role in the operation of Kaufman House came from Arlan Kaufman (Doc. 476 at p. 3408 *et seq.*). Indeed, but for the sighting by the children on the school bus, I am firmly convinced that Kaufman House would be in business today because that's what Arlan and Linda Kaufman did for a living. Defendant barely mentioned her fraudulent conduct in her statement at the time of her original sentence and not at all in her statement on resentencing. Similarly, defendant's two sentencing memoranda are silent regarding these aspects of defendant's criminal conduct. The evidence is absolutely clear and undisputed that defendant was, at the very least, an equal partner with Arlan Kaufman insofar as the financial end of the Kaufman House operation was concerned and, because the financial existence of the operation depended upon obtaining funds through fraud, Linda Kaufman's disrespect for the law equalled that of her husband. This is significant because, as pointed out by the

-13-

government in its sentencing memorandum, an alternative guideline sentence from 292 to 365 months can be based, in part, on guideline sections focusing largely on the financial aspects of defendant's criminal conduct.

One of the statutory factors I must consider is the need to avoid unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct. The only other defendant who fits this statutory provision is Arlan Kaufman. Defendant argues that Arlan Kaufman was primarily responsible for most of the bad acts and decisions that made up the crimes of conviction. As I have indicated, that argument has some merit with respect to the crimes which deal primarily with the aberrant mistreatment of the Kaufman House residents. However, it lacks any basis in the evidence with respect to the financial crimes. Nevertheless, my sentence will reflect a disparity which I believe is warranted under the evidence.

The final statutory factor I want to talk about is the need for the sentence to provide just punishment. Clearly there is no question that defendant deserves punishment and I acknowledge my error in originally setting a sentence which was too low to be just. While there are some aspects of the Court of Appeals' opinion with which I disagree, in particular what I consider to be the court's unnecessary emphasis on, and lack of understanding regarding my reasons for, the "no eye contact" ruling, I appreciate being given the opportunity to consider a new and appropriate sentence for defendant.

It is hard to adequately and succinctly describe the evidence of what went on at Kaufman House. Clearly, if such conduct by officers and staff took place in a federal or state penal institution, it would

amount to a gross violation of the inmates' constitutional rights. Over the years, I have handled numerous lawsuits regarding prison conditions and treatment of prisoners, first as an assistant U.S. attorney and now as a judge. I have never had a case where an inmate even claimed, much less proved, treatment by prison officials remotely similar to that inflicted upon the residents at Kaufman House. The closest parallel which comes to mind is the abuse of prisoners at the Abu Ghraib prison in Iraq.

All this having been said, I still am of a mind that just punishment for defendant means a sentence less than the 30 years given to her husband, whose sentence, interestingly, was not an issue in Arlan Kaufman's appeal. Arlan Kaufman will be a danger to society, even to his fellow prisoners, for his entire life. Defendant will not be. Arlan Kaufman is not merely unrepentant for his crimes, he arrogantly justifies his conduct and places all the blame on Kaufman House residents and others. This is evident from his three hour self-serving harangue at sentencing. Defendant, on the other hand, has expressed at least some regret for her crimes. While defendant participated in aspects of her husband's perverted and harmful therapy methods, it seems certain that the methods originated with and largely were carried out by Arlan Kaufman. If there are ethical principles which govern social workers, Arlan Kaufman violated all of them. To some degree, defendant's treatment of Kaufman House residents was kind and consistent with her training and ethical responsibilities as a nurse.

For all the reasons expressed, I find that a sentence of 180 months will satisfy the requirements of § 3553(a).

IT IS SO ORDERED.

Dated this __23rd__ day of November 2009, at Wichita, Kansas.

```
                                    /s/ Monti Belot
                                 _____
                                 Monti L. Belot
                                 UNITED STATES DISTRICT JUDGE
```